RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

EDWARD MONROE, FABIAN MOORE, and TIMOTHY
WILLIAMS, on behalf of themselves and all others
similarly situated,

  *Plaintiffs-Appellees*,

*v.*

FTS USA, LLC and UNITEK USA, LLC,

  *Defendants-Appellants*.

┐
│
│
│
│
│  No. 14-6063
│
│
│
│
┘

———————

On Remand from the United States Supreme Court.
No. 2:08-cv-02100—John Thomas Fowlkes, Jr., District Judge.

Decided and Filed:  June 21, 2017

Before:  BOGGS, SUTTON, and STRANCH, Circuit Judges.

———————

## COUNSEL

**ON SUPPLEMENTAL BRIEF:**  Colin D. Dougherty, Jonathan D. Christman, FOX
ROTHSCHILD LLP, Blue Bell, Pennsylvania, Miguel A. Estrada, GIBSON, DUNN
& CUTCHER LLP, Washington, D.C., for Appellants.  William B. Ryan, Bryce W. Ashby,
DONATI LAW FIRM, LLP, Memphis, Tennessee, Rachhana T. Srey, NICHOLS KASTER,
PLLP, Minneapolis, Minnesota, for Appellees.

  STRANCH, J., delivered the opinion of the court in which BOGGS, J., joined, and
SUTTON, J., joined in part.  SUTTON, J. (pp. 36–49), delivered a separate opinion concurring
in part and dissenting in part.

———————————

**OPINION**

———————————

STRANCH, Circuit Judge.   Edward Monroe, Fabian Moore, and Timothy Williams brought this Fair Labor Standards Act (FLSA) claim, on behalf of themselves and others similarly situated, against their employers, FTS USA, LLC and its parent company, UniTek USA, LLC.  FTS is a cable-television business for which the plaintiffs work or worked as cable technicians.  The district court certified the case as an FLSA collective action, allowing 293 other technicians (collectively, FTS Technicians) to opt in.  FTS Technicians allege that FTS implemented a company-wide time-shaving policy that required its employees to systematically underreport their overtime hours.  A jury returned verdicts in favor of the class, which the district court upheld before calculating and awarding damages.  On appeal, we affirmed the district court's certification of the case as a collective action and its finding that sufficient evidence supported the jury's verdicts, but reversed the district court's calculation of damages.

FTS and UniTek filed a petition for a writ of certiorari, and the Supreme Court issued a grant, vacate, and remand order (GVR)—granting the petition, vacating our opinion, and remanding the case to this court for further consideration in light of *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. —, 136 S. Ct. 1036 (2016), which the Supreme Court decided after we issued our opinion. *See FTS USA, LLC v. Monroe*, 137 S. Ct. 590 (2016) (mem.).  "[O]ur law is clear that a GVR order does not necessarily imply that the Supreme Court has in mind a different result in the case, nor does it suggest that our prior decision was erroneous." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013) (collecting cases).  Rather, our task following the GVR in this case is to "determine whether our original decision . . . was correct or whether [*Tyson*] compels a different resolution." *Id.*

Upon reconsideration, we find that *Tyson* does not compel a different resolution; instead, *Tyson's* ratification of the *Mt. Clemens* legal framework and validation of the use of representative evidence support our original decision.  Therefore, consistent with that opinion, we AFFIRM the district court's certification of the case as a collective action and its finding that

sufficient evidence supports the jury's verdicts.  We REVERSE the district court's calculation of damages and REMAND the case for recalculation of damages consistent with this opinion.

## I.      BACKGROUND

### A.      Facts

FTS contracts with various cable companies, such as Comcast and Time Warner, to provide cable installation and support, primarily in Tennessee, Alabama, Mississippi, Florida, and Arkansas.  To offer these services, FTS employs technicians at local field offices, called "profit centers."  FTS's company hierarchy includes a company CEO and president, regional directors, project managers at each profit center, and a group of supervisors.  FTS Technicians report to the supervisors and project managers.  FTS's parent company, UniTek, is in the business of wireless, telecommunication, cable, and satellite services, and provides human resources and payroll functions to FTS.

All FTS Technicians share substantially similar job duties and are subject to the same compensation plan and company-wide timekeeping system.  FTS Technicians report to a profit center at the beginning of each workday, where FTS provides job assignments to individual technicians and specifies two-hour blocks in which to complete certain jobs.  Regardless of location, "the great majority of techs do the same thing day in and day out which is install cable."  Time is recorded by hand, and FTS project managers transmit technicians' weekly timesheets to UniTek's director of payroll.  FTS Technicians are paid pursuant to a piece-rate compensation plan, meaning each assigned job is worth a set amount of pay, regardless of the amount of time it takes to complete the job.  The record shows that FTS Technicians are paid by applying a .5 multiplier to their regular rate for overtime hours.

FTS Technicians presented evidence that FTS implemented a company-wide time-shaving policy that required technicians to systematically underreport their overtime hours.  Managers told or encouraged technicians to underreport time or even falsified timesheets themselves.  To underreport overtime hours in compliance with FTS policy, technicians either began working before their recorded start times, recorded lunch breaks they did not take, or continued working after their recorded end time.

FTS Technicians also presented documentary evidence and testimony from technicians, managers, and an executive showing that FTS's time-shaving policy originated with FTS's corporate office. Technicians testified that the time-shaving policy was company-wide, applying generally to all technicians, though not in an identical manner. At meetings, managers instructed groups of technicians to underreport their hours, and managers testified that corporate ordered them to do so. One former manager, Anthony Louden, offered testimony regarding high-level executive meetings. Louden identified overtime and fuel costs as the two leading items that an FTS executive felt it "should be able to manage and cut in order to make a bigger profit." Louden also stated that FTS executives circulated and reviewed technicians' timesheets, "go[ing] into detail on which technician had overtime, and, you know, go[ing] over why this guy had too much overtime and why he didn't have overtime." Technicians testified that they often complained about being obligated to underreport, and FTS's human resources director testified that she received such complaints. No evidence was presented that managers or technicians were disciplined for underreporting time.

## B.　　Procedural History

A magistrate judge recommended conditional certification as a FLSA collective action, which the district court adopted. The district court also authorized notice of the collective action to be sent to all potential opt-in plaintiffs. The notice defined eligible class members as any person employed by FTS as a technician at any location across the country in the past three years to the present who were paid by piece-rate and did not receive overtime compensation for all hours worked over 40 per week during that period. A total of 293 technicians ultimately opted in to the collective action.[1]

The parties originally agreed on a discovery and trial plan, which the trial court adopted by order. Under the parties' agreement, discovery would be limited "to a representative sample of fifty (50) opt-in Plaintiffs," with FTS Technicians choosing 40 and FTS and UniTek choosing 10. The parties also agreed to approach the district court after discovery regarding "a trial plan

---

[1]Named plaintiff Monroe was a technician during the class period. After the class period, he was promoted to a managerial position.

based on representative proof" that "will propose a certain number of Plaintiffs from the pool of fifty (50) representative sample Plaintiffs that may be called as trial witnesses."

Following the completion of discovery, the district court denied FTS and UniTek's motions to decertify the class and for summary judgment, finding that the class members were similarly situated at the second stage of certification. In light of the parties' agreement and the district court's resulting order—under which the litigation proceeded—the court held that it could not "accept Defendants' contention that the parties' stipulated agreement to limit discovery to fifty representative plaintiffs did not also manifest Defendants' acquiescence to a process by which the remaining members of the class would not have to produce evidence as a prerequisite to proceeding to trial on their claims." (R. 238, PageID 5419.) The district court also denied FTS and UniTek's pretrial motion to preclude representative proof at trial because "the class representatives identified by Plaintiff[s] sufficiently represent the class" and "[t]o deny the use of representative proof in this case would undermine the purpose of class wide relief, and would have the effect of decertifying the class." (R. 308, PageID 6822.)

Accordingly, the collective action proceeded to trial on a representative basis. FTS Technicians identified by name 38 potential witnesses and called 24 witnesses, 17 of whom were class-member technicians. FTS and UniTek identified all 50 representative technicians as potential witnesses, but called only four witnesses—all FTS executives and no technicians.

The district court explained the representative nature of the collective action to the jury, both before the opening argument and during its instructions, noting that FTS Technicians seek "to recover overtime wages that they claim [FTS and UniTek] owe them and the other cable technicians who have joined the case." (R. 450, PageID 10646–47; R. 463, PageID 12253.) The jury instructions specified that the named plaintiffs brought their claim on behalf of and collectively with "approximately three hundred plaintiffs who have worked in more than a dozen different FTS field offices across the country." (R. 463, PageID 12264.) The court also set out how the case would be resolved, instructing that FLSA procedure "allows a small number of representative employees to file a lawsuit on behalf of themselves and others in the collective group"; that the technicians who "testified during this trial testified as representatives of the other plaintiffs who did not testify"; and that "[n]ot all affected employees need testify to prove their

claims" because "non-testifying plaintiffs who performed substantially similar job duties are deemed to have shown the same thing." (*Id.* at 12264–65.) The district court then charged the jury to determine whether all FTS Technicians "have proven their claims" by considering whether "the evidence presented by the representative plaintiffs who testified establishes that they worked unpaid overtime hours and are therefore entitled to overtime compensation." (*Id.* at 12265.) If the jury answers in the affirmative, the court explained, "then those plaintiffs that you did not hear from are also deemed by inference to be entitled to overtime compensation." (*Id.* at 12265–66.)

The jury returned verdicts of liability in favor of the class, finding that FTS Technicians worked in excess of 40 hours weekly without being paid overtime compensation and that FTS and UniTek knew or should have known and willfully violated the law. The jury determined the average number of unrecorded hours worked per week by each testifying technician—all of whom were representative and were called on behalf of themselves and all similarly situated employees, as authorized by 29 U.S.C. § 216(b) and instructed by the district court. As indicated to the parties and the jury, the court used the jury's factual findings to calculate damages for all testifying and nontestifying technicians in the opt-in collective action. The trial court ruled that the formula for calculating uncompensated overtime should use a 1.5 multiplier, apparently based on the assumption that FTS and UniTek normally used that multiplier.

The district court[2] held a post-trial status conference and suggested that a second jury could be convened to decide the issue of damages. FTS and UniTek opposed a second jury, arguing that plaintiffs had failed to prove damages and judgment should be entered, "either for the defense or liability for plaintiffs . . . with zero damages." After the court rejected this proposal, FTS and Unitek filed motions for judgment as a matter of law, a new trial, and decertification, all of which were denied. Finding that FTS Technicians had met their burden on damages, the court adopted their proposed order, using an "estimated-average" approach to calculate damages and employing a multiplier of 1.5.

---

[2]The Honorable Bernice Bouie Donald presided over all pretrial and trial issues before assuming her position on the Sixth Circuit. The Honorable Jon Phipps McCalla and John T. Fowlkes, Jr. presided over all post-trial issues, including the calculation of damages.

## II.    ANALYSIS

FTS and UniTek challenge the certification of the case as a collective action pursuant to 29 U.S.C. § 216(b), the sufficiency of the evidence as presented at trial, the jury instruction on commuting time, and the district court's calculation of damages.  After a review of the legal framework for collective actions in our circuit, we turn to each of these arguments.

### A.    Legal Framework

1.    <u>Certification and Burden of Proof Under the FLSA</u>

Under the FLSA, an employer generally must compensate an employee "at a rate not less than one and one-half times the regular rate at which he is employed" for work exceeding forty hours per week.  29 U.S.C. § 207(a)(1).  Labor Department regulations clarify, however, that in a piece-rate system only "additional half-time pay" is required for overtime hours.  29 C.F.R. § 778.111(a).

"Congress passed the FLSA with broad remedial intent" to address "unfair method[s] of competition in commerce" that cause "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015); 29 U.S.C. § 202(a).  The provisions of the statute are "remedial and humanitarian in purpose," and "must not be interpreted or applied in a narrow, grudging manner."  *Herman v. Fabri-Centers of Am., Inc.*, 308 F.3d 580, 585 (6th Cir. 2002) (quoting *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944), *superseded by statute on other grounds*, Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251–262).

To effectuate Congress's remedial purpose, the FLSA authorizes collective actions "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  To participate in FLSA collective actions, "all plaintiffs must signal in writing their affirmative consent to participate in the action."  *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).  Only "similarly situated" persons may opt in to such actions.  *Id.*  Courts typically bifurcate certification of FLSA collective action cases.  At the

notice stage, conditional certification may be given along with judicial authorization to notify similarly situated employees of the action. *Id.* Once discovery has concluded, the district court—with more information on which to base its decision and thus under a more exacting standard—looks more closely at whether the members of the class are similarly situated. *Id.* at 547.

In *O'Brien v. Ed Donnelly* Enterprises*, Inc.*, we clarified the contours of the FLSA standard for certification. There, employees alleged that their employer violated the FLSA by requiring employees to work "off the clock," doing so in several ways—requiring unreported hours before or after work or by electronically altering their timesheets. 575 F.3d 567, 572–73 (6th Cir. 2009). The district court initially certified the *O'Brien* case as a collective action. *Id.* at 573. At the second stage of certification, the court determined that the claims required "an extensive individualized analysis to determine whether a FLSA violation had occurred" and that "the alleged violations were not based on a broadly applied, common scheme." *Id.* at 583. Applying a certification standard akin to that for class actions pursuant to Federal Rule of Civil Procedure 23, the district court decertified the collective action on the basis that individualized issues predominated. *Id.* at 584.

On appeal, we determined that the district court engaged in an overly restrictive application of the FLSA's "similarly situated" standard. It "implicitly and improperly applied a Rule 23-type analysis when it reasoned that the plaintiffs were not similarly situated because individualized questions predominated," which "is a more stringent standard than is statutorily required." *Id.* at 584–85. We explained that "[w]hile Congress could have imported the more stringent criteria for class certification under Fed. R. Civ. P. 23, it has not done so in the FLSA," and applying a Rule 23-type predominance standard "undermines the remedial purpose of the collective action device." *Id.* at 584–86. Based on our precedent, then, the FLSA's "similarly situated" standard is less demanding than Rule 23's standard.

*O'Brien* applied the three non-exhaustive factors that many courts have found relevant to the FLSA's similarly situated analysis: (1) the "factual and employment settings of the individual[] plaintiffs"; (2) "the different defenses to which the plaintiffs may be subject on an individual basis"; and (3) "the degree of fairness and procedural impact of certifying the action

as a collective action." *Id.* at 584 (quoting 7B Wright, Miller & Kane, Federal Practice and Procedure § 1807 at 487 n.65 (3d ed. 2005)); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261–65 (11th Cir. 2008) (applying factors); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001) (applying factors); *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 672 (6th Cir. 2012) (concluding that district court properly exercised its discretion in weighing the *O'Brien* factors and granting certification). Noting that "[s]howing a 'unified policy' of violations is not required," we held that employees who "suffer from a single, FLSA-violating policy" *or* whose "claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct," are similarly situated. *O'Brien*, 575 F.3d at 584–85; *see also* 2 ABA Section of Labor & Emp't Law, The Fair Labor Standards Act 19-151, 19-156 (Ellen C. Kearns ed., 2d ed. 2010) (compiling cases supporting use of the three factors and noting that "many courts consider whether plaintiffs have established a common employer policy, practice, or plan allegedly in violation of the FLSA," which may "assuage concerns about the plaintiffs' otherwise varied circumstances").

Applying this standard, we found the *O'Brien* plaintiffs similarly situated. We determined that the district court erred because plaintiffs' claims were unified, as they "articulated two common means by which they were allegedly cheated: forcing employees to work off the clock and improperly editing time-sheets." *O'Brien*, 575 F.3d at 585. However, due to *O'Brien*'s peculiar procedural posture (the only viable plaintiff remaining did not allege that she experienced the unlawful practices), remand for recertification was not appropriate. *Id.* at 586. In sum, *O'Brien* explained the FLSA standard for certification, distinguishing it from a Rule 23-type predominance standard, and adopted the three-factor test employed by several of our sister circuits. *Id.* at 585.

Just as *O'Brien* clarifies the procedure and requirements for certification of a collective action, the Supreme Court's opinion in *Anderson v. Mt. Clemens Pottery Co.*—originally a Sixth Circuit case—explains the burden of proof at trial. Using a formula "applicable to all employees," the district court there awarded piece-rate employees recovery of some unpaid overtime compensation under the FLSA. 328 U.S. 680, 685–86 (1946), *superseded by statute on*

*other grounds*, Portal-to-Portal Act of 1947. We reversed on appeal, determining that the district court improperly awarded damages and holding that it was the employees' burden "to prove by a preponderance of the evidence that they did not receive the wages to which they were entitled . . . and to show by evidence rather than conjecture the extent of overtime worked, it being insufficient for them merely to offer an estimated average of overtime worked." *Id.* at 686.

On certiorari, the Supreme Court held that we had imposed an improper standard of proof that "has the practical effect of impairing many of the benefits" of the FLSA. *Id.* It reminded us of the correct liability and damages standard, with a cautionary note: an employee bringing such a suit has the "burden of proving that he performed work for which he was not properly compensated. The remedial nature of this statute and the great public policy which it embodies . . . militate against making that burden an impossible hurdle for the employee." *Id.* at 686–87. We have since acknowledged that instruction. *See Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015). The Supreme Court also explained how an employee can satisfy his burden to prove both uncompensated work and its amount: "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687. The employee's burden of proof on damages can be relaxed, the Supreme Court explained, because employees rarely keep work records, which is the employer's duty under the Act. *Id.*; *see O'Brien*, 575 F.3d at 602; *see also* 29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a)(7). Once the employees satisfy their relaxed burden for establishing the extent of uncompensated work, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Mt. Clemens*, 328 U.S. at 687–88.

We quoted and applied this standard in *Herman v. Palo Group Foster Home, Inc.*, concluding that the employees had met their burden on liability because "credible evidence" had been presented that they had performed work for which they were improperly compensated. 183 F.3d 468, 473 (6th Cir. 1999). Also recognizing this shifting burden, we held that

"Defendants did not keep the records required by the FLSA, so the district court properly shifted the burden to Defendants to show that they did not violate the Act." *Id.* The end result of this standard is that if an "employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 472 (quoting *Mt. Clemens*, 328 U.S. at 688).

The core standards set out in the cases above are reinforced by the Supreme Court's recent decision in *Tyson*. There, employees of Tyson Foods, working in over 400 jobs across three departments in a pork processing plant, sued under the FLSA claiming that they did not receive overtime pay for time spent donning and doffing the protective gear specific to their job. 136 S. Ct. at 1041–42. The employees sought certification as a class action under Federal Rule of Civil Procedure 23 and as a collective action under 29 U.S.C. § 216. *Id.* at 1042. The district court certified the action over Tyson's objection that the employees' claims were too dissimilar for resolution on a classwide basis because the employees took varying amounts of time to don and doff varying kinds of gear. *Id.* at 1042–43. Because Tyson did not keep time records as required by the FLSA, the employees relied on representative evidence in the form of employee testimony, video recordings, and an expert study that estimated the average time spent donning and doffing equipment in different departments based on video observations. *Id.* at 1043. According to the employees' expert, donning and doffing time varied among workers, ranging from about 30 seconds to ten minutes in one department, and from two to nine minutes in another. *Id.* at 1055 (Thomas, J., dissenting). Subsequently, Tyson argued to the jury that this same variance made classwide recovery improper. *Id.* at 1044 (majority opinion). The jury found Tyson liable, but awarded significantly less in aggregate damages than the expert's estimated times would have supported. *Id.* The district court denied Tyson's post-trial motions, including its motion to decertify the class, and the Eighth Circuit affirmed.

Before the Supreme Court, Tyson challenged the certification of the class and collective actions, raising arguments comparable to those made by FTS and UniTek here—that using a representative sample "manufactures predominance," absolves employees of their burden to prove personal injury, and robs an employer of the right "to litigate its defenses to individual claims." *Id.* at 1046. Based on these objections, Tyson sought a ban on representative evidence.

*Id.* In response, the Supreme Court examined whether the employees' class certification under Rule 23 was appropriate given that the employees' key evidence, compiled in their expert's average time estimates, assumed that the various employees spent the same average time donning and doffing. *Id.* at 1041, 1046. Finding that the requested ban "would make little sense," the Court affirmed the class certification as proper, holding that the expert's study was admissible as representative evidence and that the jury's reliance on the study's assumption was permissible under *Mt. Clemens*. *Id.* at 1046–47; *id.* at 1046 ("In many cases, a representative sample is 'the only practicable means to collect and present relevant data' establishing a defendant's liability." (quoting *Manual of Complex Litigation* § 11.493, at 102 (4th ed. 2004))).

*Tyson* does not compel a result different from the original opinion in this case. It supports that decision because it reaffirms *Mt. Clemens*, its burden-shifting framework, and the permissibility of "just and reasonable inference[s]" from plaintiffs' evidence in FLSA cases where employers do not keep required records. *Id.* (quoting *Mt. Clemens*, 328 U.S. at 687). *Tyson*, moreover, analyzed the issue of "generalized class-wide proof" through the predominance requirement for class certification under Rule 23, *id.* at 1045, which we have held "is a more stringent standard than is statutorily required" for collective actions under § 216, *O'Brien*, 575 F.3d at 585. The Supreme Court's ruling authorizing representative evidence under the standards of Rule 23 is therefore more than sufficient to cover FLSA collective actions under § 216— actions that effectuate the "remedial nature of [the FLSA] and the great public policy which it embodies." *Tyson*, 136 S. Ct. at 1047 (alteration in *Tyson*) (quoting *Mt. Clemens*, 328 U.S. at 687). Thus, the certification standards and burdens of proof for collective actions that we set out and applied in our original opinion are confirmed in *Tyson*. And, because *Tyson* did not address damages, our analysis on damages is also unaffected.

FTS and UniTek contend that two pieces of dicta in *Tyson* control this case. First, they challenge the district court's instruction that non-testifying technicians would be "deemed to have shown the same thing" as the testifying technicians, arguing that the instruction usurped the jury's role of determining the representativeness of the evidence. FTS and UniTek rely on the Court's acknowledgement that the persuasiveness of admitted evidence is generally a matter for the jury, including the question of "whether the average time [the employees' expert] calculated

is probative as to the time actually worked by each employee." *Id.* at 1049. The Supreme Court, however, made this reference to illustrate the role of the district court in granting class certification. *See id.* ("The District Court could have denied class certification on this ground only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing."). This dictum concerned how district courts should assess the representativeness of an expert's statistical average for class certification purposes, not how a district court could exercise its discretion to instruct a jury or structure a verdict form. The court below properly instructed the jury that FLSA procedure allows representative employees to file a lawsuit on behalf of a collective group and that the testimony of some may be considered representative proof on behalf of the whole class. *See supra* pp. 5–6; *infra* pp. 23–24 (citing precedent from nine sister circuits permitting representative testimony to establish liability for non-testifying employees in FLSA cases). The verdict form here permitted the jury to determine whether FTS applied a single, company-wide time-shaving policy to all FTS Technicians, including non-testifying employees. *See infra* pp. 26–27. *Tyson*, whose holding related only to class certification, does not require reversal of a trial that included a jury instruction or form concerning the nature of representative evidence in FLSA collective actions.

Second, FTS and UniTek turn to the Supreme Court's statement that representative evidence that is "statistically inadequate or based on implausible assumptions" could not be used to draw "just and reasonable" inferences about the number of uncompensated hours an employee worked. *Id.* at 1048–49 (quoting *Mt. Clemens*, 328 U.S. at 687, for the latter quotation). According to FTS and UniTek, the failure of FTS Technicians to present a statistical expert and study was a failure that should have ended the litigation or prohibited FTS Technicians' reliance on the testimony of 17 technicians. *Tyson* does not impose such a requirement. The Court's statement about statistical adequacy was made in the context of the admissibility of representative evidence. *See id.* at 1049 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). FTS and UniTek do not challenge the admissibility of the testimony of the 17 technicians, but rather the sufficiency of FTS Technicians' representative evidence. And, significantly, *Tyson* did not discuss expert statistical studies because they are the *only* way a plaintiff may prove an FLSA claim, but because those plaintiffs offered such a study—along with employee testimony and video recordings. For our purposes when assessing the sufficiency

of the evidence, "the only issue we must squarely decide is whether there was legally sufficient evidence—representative, direct, circumstantial, in-person, by deposition, or otherwise—to produce a reliable and just verdict." *Morgan*, 551 F.3d at 1280. As will be shown below, FTS Technicians presented more than sufficient evidence from representative technicians along with "good old-fashioned direct evidence," including six managers and supervisors and documentary proof containing timesheets and payroll records. *See infra* Part C.1. The 17 testifying technicians, moreover, were drawn from the representative sample of 50 technicians agreed upon by both parties. FTS and UniTek included all 50 technicians from this sample on their witness list and had, but chose not to exercise, the right to call any of them to challenge the representativeness of the testifying technicians. FTS and UniTek seek what *Tyson* rejected, "broad and categorical rules governing the use of representative and statistical evidence in class actions." *Id.* at 1049. *Tyson* did not create a rule limiting representative evidence beyond the well-established standards of admissibility.

In summary, *Tyson* approved the use of representative evidence in a FLSA case similar to this one and expressly reaffirmed the principles set out in *Mt. Clemens*. It reinforced the remedial nature and underlying public policy of the FLSA and explicitly declined to set broad rules limiting the types of evidence permissible in FLSA collective actions. We conclude that *Tyson* does not change our analysis in this case.

## B.    Certification as a Collective Action

FTS and UniTek appeal the denial of their motion to decertify the collective action. We review a district court's certification of a collective action under an "abuse of discretion" standard. *See O'Brien*, 575 F.3d at 584. "A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Auletta v. Ortino* (*In re Ferro Corp. Derivative Litig.*), 511 F.3d 611, 623 (6th Cir. 2008).

The district court made its final certification determination post-trial. With the benefit of the entire trial record—including representative testimony from technicians covering the several regions in which FTS operates—the court found that FTS Technicians were similarly situated

and a collective action was appropriate. FTS and UniTek challenge certification of the case as a collective action, arguing that differences among FTS Technicians (differences in location, supervisors, reasons for submitting false timesheets, and types and amount of uncompensated time) require an individualized analysis as to every plaintiff to determine whether a particular violation of the FLSA took place for each.

Turning to review, we may not examine the certification issue using a Rule 23-type analysis; we must apply the "similarly situated" standard governed by the three-factor test set out in *O'Brien*. Two governing principles from our case law serve as guides: plaintiffs do not have to be "identically situated" to be similarly situated, and the FLSA is a remedial statute that should be broadly construed. 2 ABA Section of Labor & Emp't Law, *supra*, at 19-150, 19-166 (compiling cases).

### 1.    Factual and Employment Settings

The first factor, the factual and employment settings of the individual FTS Technicians, considers, "to the extent they are relevant to the case, the plaintiffs' job duties, geographic locations, employer supervision, and compensation." *Id.* at 19-155. On FTS Technicians' duties and locations, the record reveals that all FTS Technicians work in the same position, have the same job description, and perform the same job duties: regardless of location, "the great majority of techs do the same thing day in and day out which is install cable." FTS Technicians also are subject to the same timekeeping system (recording of time by hand) and compensation plan (piece rate).

Key here, the record contains ample evidence of a company-wide policy of requiring technicians to underreport hours that originated with FTS executives. Managers told technicians that they received instructions to shave time from corporate, that underreporting is "company policy," and that they were "chewed out by corporate" for allowing too much time to be reported. Managers testified that FTS executives directed them to order technicians to underreport time. FTS executives reinforced their policy during meetings with managers and technicians at individual profit centers. FTS Technicians testified that they complained of being required to underreport, often in front of or to corporate representatives, who did nothing.

Evidence of market pressures suggests that FTS executives had a motive to institute a company-wide time-shaving policy. According to one manager's testimony, "[e]very profit center has . . . a budget," and to meet that budget "you couldn't put all of your overtime." Both managers and technicians were under the impression that FTS's profitability depended on underreporting.

The underreporting policy applied to FTS Technicians regardless of profit center or supervisor, as technicians employed at multiple profit centers and under multiple managers reported consistent time-shaving practices across the centers and managers. Namely, FTS executives told managers that technicians' time before and after work or during lunch should be underreported. One manager told his technicians that "an hour lunch break will be deducted whether [they] take it or not," while technicians who reported full hours were told to "change that" and that "[t]his is not how we do it over here, . . . you are just supposed to record your 40 hours a week, take out for your lunch, sign it and turn it in." If technicians failed to comply with the policy, managers would directly alter time sheets submitted by employees—one manager changed a seven to an eight and another used whiteout to change times. Regarding reporting lunch hours not taken, one manager said "that's the way it's got to be, you put it on there or I'll put it on there." Even technicians who never received direct orders from managers to underreport time knew that FTS required underreporting in order to continue receiving work assignments and to avoid reprimand or termination.

FTS Technicians identified the methods—the same methods found in *O'Brien*—by which FTS and UniTek enforced their time-shaving policy: (1) "requiring plaintiffs to work 'off the clock'" before or after scheduled hours or during lunch breaks and (2) "alter[ing] the times that had previously been entered." *O'Brien*, 575 F.3d at 572–73. As in *O'Brien*, such plaintiffs will be similarly situated where their claims are "unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Id.* at 585.

The dissent asserts that FTS Technicians allege "distinct" violations of the FLSA and "define the company-wide 'policy' at such a lofty level of generality that it encompasses *multiple* policies." (Dis. at 39–40.) The definition of similarly situated does not descend to such a level

of granularity. The Supreme Court has warned against such a "narrow, grudging" interpretation of the FLSA and has instructed courts to remember its "remedial and humanitarian" purpose, as have our own cases. *See Tenn. Coal, Iron & R.R. Co.*, 321 U.S. at 597; *Keller*, 781 F.3d at 806; *Herman*, 308 F.3d at 585. Many FLSA cases do focus on a single action, such as the donning and doffing cases that the dissent's reasoning would suggest is the only situation where representative proof would work. But neither the statutory language nor the purposes of FLSA collective actions require a violating policy to be implemented by a singular method. The dissent cites no Sixth Circuit case that would compel employees to bring a separate collective action (or worse, separate individual actions) for unreported work required by an employer before clocking in, and another for work required after clocking out, and another for work required during lunch, and yet another for the employer's alteration of its employees' timesheets. Such a narrow interpretation snubs the purpose of FLSA collective actions.

The dissent concludes that FTS Technicians' claims do "not do the trick" because a "company-wide 'time-shaving' policy is lawyer talk for a company-wide policy of violating the FLSA." (Dis. at 40.) But FTS Technicians' claims do not depend on "lawyer talk"; they are based on abundant evidence in the record of employer mandated work off the clock. That an employer uses more than one method to implement a company-wide work "off-the-clock" policy does not prevent employees from being similarly situated for purposes of FLSA protection. This is not a new concept to our court or to other courts. In accordance with *O'Brien*, we have approved damages awards to FLSA classes alleging that employers used multiple means to undercompensate for overtime. *See, e.g.*, *U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 778 (6th Cir. 1995) (approving damages award where employers required employees to work uncompensated time both before and after their scheduled shifts and to report only the scheduled shift hours on their timesheets). Other circuits and district courts have done so as well. *See McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 588 (9th Cir. 1988) (affirming damages award where employees gave varied testimony on the means employer used to underpay overtime); *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 84 (10th Cir. 1983) (affirming damages award where employer failed to compensate for overtime both before and after work, at different locations); *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *5 (M.D. Tenn. Sept. 26, 2006)

(denying motion to decertify class that alleged employer deprived employees of overtime compensation by requiring them to work off the clock and shaving hours from payroll records).

Like the plaintiffs in *O'Brien*, FTS Technicians' claims are unified by common theories: that FTS executives implemented a single, company-wide time-shaving policy to force all technicians—either through direct orders or pressure and regardless of location or supervisor—to underreport overtime hours worked on their timesheets. *See O'Brien*, 575 F.3d at 584–85; *see also Brennan v. Gen. Motors* Acceptance *Corp.*, 482 F.2d 825, 829 (5th Cir. 1973) (affirming finding of uncompensated overtime where employees understated overtime because of pressure brought to bear by immediate supervisors, putting upper management on constructive notice of potential FLSA violations). Based on the record as to FTS Technicians' factual and employment settings, therefore, the district court did not abuse its discretion in finding FTS Technicians similarly situated.

2.     Individualized Defenses

We now turn to the second factor—the different defenses to which the plaintiffs may be subject on an individual basis. FTS and UniTek argue that they must be allowed to raise separate defenses by examining each individual plaintiff on the number of unrecorded hours they worked, but that they were denied that right by the allowance of representative testimony and an estimated-average approach. Several circuits, including our own, hold that individualized defenses alone do not warrant decertification where sufficient common issues or job traits otherwise permit collective litigation. *O'Brien*, 575 F.3d at 584–85 (holding that employees are similarly situated if they have "claims . . . unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct"); *Morgan*, 551 F.3d at 1263; *see Thiessen*, 267 F.3d at 1104–08.

As noted above, the record includes FTS Technicians' credible testimonial and documentary evidence that they performed work for which they were improperly compensated. In the absence of accurate employer records, both Supreme Court and Sixth Circuit precedent dictate that the burden then shifts to the employer to "negative the reasonableness of the inference to be drawn from the employee's evidence" and, if it fails to do so, the resulting

damages award need not be perfectly exact or precise. *Mt. Clemens*, 328 U.S. at 687–88 ("The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the FLSA]."); *see Herman*, 183 F.3d at 473.

Under this framework, and with the use of representative testimony and an estimated-average approach, defenses successfully asserted against representative testifying technicians were properly distributed across the claims of nontestifying technicians. For example, FTS and UniTek argue that testifying technicians did not work all of the overtime they claimed and underreported some of their overtime for reasons other than a company-wide policy requiring it. FTS and UniTek had every opportunity to submit witnesses and evidence supporting this claim. The jury's partial acceptance of these defenses, as evidenced by its finding that testifying technicians worked fewer hours than they claimed, resulted in a lower average for nontestifying technicians. Thus, FTS Technicians' representative evidence allowed appropriate consideration of the individual defenses raised here. The district court, moreover, offered to convene a second jury and submit the issue of damages to it, but FTS and UniTek declined. *See Thiessen*, 267 F.3d at 1104–08 (concluding that district court abused its discretion in decertifying the class because defendants' "highly individualized" defenses could be dealt with at the damages stage of trial). Under our precedent and the trial record, we cannot say that the district court committed a clear error of judgment in refusing to decertify the collective action on the basis of FTS and UniTek's claimed right to examine and raise defenses separately against each of the opt-in plaintiffs.

### 3.　　Fairness and Procedural Impact

The third factor, the degree of fairness and the procedural impact of certifying the case, also supports certification. This case satisfies the policy behind FLSA collective actions and Congress's remedial intent by consolidating many small, related claims of employees for which proceeding individually would be too costly to be practical. *See Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (noting that FLSA collective actions give plaintiffs the "advantage of lower individual costs to vindicate rights by the pooling of resources"); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013) ("[W]here it is class treatment or nothing, the district court must carefully explore the possible ways of overcoming

problems in calculating individual damages.").  Because all FTS Technicians allege a common, FLSA-violating policy, "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact."  *Hoffman-La Roche, Inc.*, 493 U.S. at 170.  In view of the entire record, neither this factor nor the other two suggest that the district court abused its discretion in finding FTS Technicians similarly situated and maintaining certification.

### 4.    The Seventh Circuit Decision in *Espenscheid*

Lastly, FTS and UniTek argue that *Espenscheid*—a Seventh Circuit case affirming the decertification of a collective action seeking unpaid overtime—compels decertification here.  705 F.3d at 773.  *Espenscheid*, however, is based on Seventh Circuit authority and specifically acknowledges that it is at odds with Sixth Circuit precedent.  *Id.* at 772 (citing *O'Brien*, 575 F.3d at 584).  Though recognizing the differences between Rule 23 class actions and FLSA collective actions—and admitting that Rule 23 procedures are absent from the statutory provisions of the FLSA—the Seventh Circuit determined that "there isn't a good reason to have different standards for the certification of the two different types of action."  *Id.*  This conflicts with our precedent.  Explaining that Congress could have but did not import the Rule 23 predominance requirement into the FLSA and that doing so would undermine the remedial purpose of FLSA collective actions, we have refused to equate the FLSA certification standard for collective actions to the more stringent certification standard for class actions under Rule 23.  *O'Brien*, 575 F.3d at 584, 585–86.

The difference between the Seventh Circuit's standard for collective actions and our own is the controlling distinction for the issues before us.[3]  The facts and posture of *Espenscheid,* however, also distinguish it from this case.  There, the district court decertified the collective action before trial, after which the parties settled their claims but appealed the decertification.  Reviewing for abuse of discretion, the Seventh Circuit affirmed the district court.  The circuit opinion noted that the plaintiffs had recognized the possible need for individualized findings of

---

[3]The dissent suggests we must follow *Espenscheid* because it "involved the *same defendant in this case*." (Dis. at 38.)  UniTek, the parent company that provided human resources and payroll functions, was involved in both cases, but at issue in each case was what the direct employer—here FTS, there DirectSat USA—required regarding the reporting of overtime.

liability for a class of 2,341 members—nearly 10 times larger than the group here—but "truculently" refused to accept a specific plan for litigation or propose an alternative and failed to specify the other kinds of evidence that they intended to use to supplement the representative testimony. *Espenscheid*, 705 F.3d at 775–76; *see Thompson v. Bruister & Assocs., Inc.*, 967 F. Supp. 2d 1204, 1216 (M.D. Tenn. 2013) (holding that *Espenscheid* cannot "conceivably be read as an overall indictment of utilizing a collective action as a vehicle to establish liability in piece-rate cases . . . because the Seventh Circuit was presented with little choice but to hold as it did, given the lack of cooperation by plaintiffs' counsel in explaining how they intended to prove up their case"). The opinion additionally references no evidence similar to that supporting the time-shaving policy here. And the proposed, but not agreed-upon, representative sample in *Espenscheid* constituted only 1.8% of the collective action, and the method of selecting the sample was unexplained. *Espenscheid*, 705 F.3d at 774.

Conversely, FTS and UniTek ask us to overturn a case tried to completion. They seek a determination that the district court *abused its discretion* in declining to decertify the 293-member collective action after both parties preliminarily agreed to a representative trial plan, completed discovery on that basis, and jointly selected the representative members. The jury here, moreover, heard representative testimony from 5.7% of the class members at trial, FTS and UniTek had abundant opportunity to provide contradictory testimony, and FTS Technicians also submitted testimony from managers and supervisors along with documentary proof. Upon completion of the case presentations by the parties, and following jury instructions regarding collective actions, the jury returned verdicts in favor of FTS Technicians. In light of these legal, factual, and procedural differences, *Espenscheid* is simply not controlling.

To conclude our similarly situated analysis, certification here is supported by our standard. The factual and employment settings of individual FTS Technicians and the degree of fairness and the procedural impact of certifying the case favor upholding certification. FTS and UniTek's alleged individual defenses do not require decertification because they can be, and were, adequately presented in a collective forum. On the record before us, the district court was within its wide discretion to try the claims as a collective action and formulated a trial plan that appropriately did so. Based on the record evidence of a common theory of violation—namely,

an FLSA-violating time-shaving policy implemented by corporate—we affirm the district court's certification of this case as a collective action.

## C.      Sufficiency of the Evidence

At the close of FTS Technicians' case and after the jury verdicts, FTS and UniTek moved for judgment as a matter of law, challenging the sufficiency of the evidence, particularly the allowance of representative testimony at trial to prove liability and the use of an estimated-average approach to calculate damages. The district court denied the motion, which FTS and UniTek now appeal.

"Our review of the sufficiency of the evidence is by review of a trial judge's rulings on motions for directed verdict or [judgment as a matter of law]." *Young v. Langley*, 793 F.2d 792, 794 (6th Cir. 1986). We review de novo a post-trial decision on a motion for judgment as a matter of law by applying the same standard used by the district court. *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 818 (6th Cir. 2013). "Judgment as a matter of law may only be granted if . . . there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). The court must decide whether there was sufficient evidence to support the jury's verdict, without weighing the evidence, questioning the credibility of the witnesses, or substituting the court's judgment for that of the jury. *Waldo*, 726 F.3d at 818. We must view the evidence in the light most favorable to the party against whom the motion is made, giving that party the benefit of all reasonable inferences. *Id.*

Pursuant to *Mt. Clemens*, the evidence as a whole must be sufficient to find that FTS Technicians performed work for which they were improperly compensated (i.e., liability) and sufficient to support a just and reasonable inference as to the amount and extent of that work (i.e., damages). *Mt. Clemens*, 328 U.S. at 687. "[T]he only issue we must squarely decide is whether there was legally sufficient evidence—representative, direct, circumstantial, in-person, by deposition, or otherwise—to produce a reliable and just verdict." *Morgan*, 551 F.3d at 1280. Plaintiffs have the initial burden to make the liability and damages showing at trial; once made, the burden shifts to defendants to prove the precise amount of work performed or otherwise rebut

the reasonably inferred damages amount. *Id.* at 687–88. If defendants fail to carry this burden, the court may award the reasonably inferred, though perhaps approximate, damages. *Id.* at 688.

### 1. Liability

FTS and UniTek challenge the district court's allowance of representative testimony to prove liability for nontestifying technicians. We have recognized that "representative testimony from a subset of plaintiffs [can] be used to facilitate the presentation of proof of FLSA violations, when such proof would normally be individualized." *O'Brien*, 575 F.3d at 585. Preceding *O'Brien*, we affirmed an award of back wages for unpaid off-the-clock hours based on representative testimony in *Cole Enterprises, Inc.*, 62 F.3d at 781. There, the defendant objected to an award of back wages to nontestifying employees, which was based on representative testimony at trial, interview statements, and the employment records. *Id.* We endorsed the sufficiency of representative testimony, holding that "[t]he testimony of fairly representative employees may be the basis for an award of back wages to nontestifying employees." *Id.*

In FLSA cases, the use of representative testimony to establish class-wide liability has long been accepted. In the 1980s, the Tenth Circuit approved the use of representative testimony in a situation comparable to this case. There, the employer did not pay overtime to employees working cash-register stations before or after scheduled shift hours in six service stations in two states. *Simmons Petroleum Corp.*, 725 F.2d at 84. Though only twelve employees testified, the Tenth Circuit held that representative testimony "was sufficient to establish a pattern of violations," explaining that the rule in favor of representative testimony is not limited "to situations where the employees leave a central location together at the beginning of a work day, work together during the day, and report back to the central location at the end of the day." *Id.* at 86 & n.3. More recently, the Tenth Circuit continued this line of reasoning in another FLSA case against Tyson Foods, upholding a jury verdict for plaintiffs and explaining that, in order to prove liability as to each class member, "Plaintiffs did not need to individualize the proof of undercompensation once the district court ordered certification." *Garcia v. Tyson Foods, Inc.*, 770 F.3d 1300, 1307 (10th Cir. 2014). "[T]he jury could reasonably rely on representative evidence to determine class-wide liability" when the employer failed to keep required records. *Id.*

In another comparable FLSA case, the Eleventh Circuit held that, "[i]f anything, the *Mt. Clemens* line of cases affirms the general rule that not all employees have to testify to prove overtime violations." *Morgan*, 551 F.3d at 1279. Although *Mt. Clemens*'s burden shifting framework did not apply because the employer kept "thorough payroll records," representative testimony could rebut on a collective basis the employer's allegedly individualized defenses to liability. *Id.* at 1276. To do so, seven plaintiffs testified on behalf of 1,424 plaintiffs, less than 1% of the total number. *Id.* The Eleventh Circuit found that the employer could not validly complain about the ratio of testifying plaintiffs where, as here, the trial record contained other "good old-fashioned direct evidence," *id.* at 1277, and the employer opposed the plaintiffs' introduction of additional testimony while choosing not to present its own, *id.* at 1277–78. As for the employer's argument that its defenses were so individualized that the testifying plaintiffs could not fairly represent those not testifying, the circuit court held that "[f]or the same reasons that the court did not err in determining that the Plaintiffs were similarly situated enough to maintain a collective action, it did not err in determining that the Plaintiffs were similarly situated enough to testify as representatives of one another." *Id.* at 1280. The same is true here.

Our sister circuits overwhelmingly recognize the propriety of using representative testimony to establish a pattern of violations that include similarly situated employees who did not testify. *See, e.g.*, *Garcia*, 770 F.3d at 1307 (quoting the Ninth Circuit's *Henry v. Lehman Commercial Paper, Inc.*, 471 F.3d 977, 992 (9th Cir. 2006), for the proposition that "[t]he class action mechanism would be impotent" without representative proof and the ability to draw class-wide conclusions based on it); *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) ("[I]t is well-established that the Secretary may present the testimony of a representative sample of employees as part of his proof of the prima facie case under the FLSA."); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees."); *Brock v. Tony & Susan Alamo Found.*, 842 F.2d 1018, 1019–20 (8th Cir. 1988) ("[T]o compensate only those associates who chose or where chosen to testify is inadequate in light of the finding that other employees were improperly compensated."); *Ho Fat Seto*, 850 F.2d at 589 (holding that, based on representative testimony, "[t]he twenty-three non-testifying employees established a prima facie case that they had worked unreported hours"); *Donovan v. Bel-Loc Diner, Inc.*,

780 F.2d 1113, 1116 (4th Cir. 1985) (holding that requirement that testimony establishing a pattern or practice must refer to all nontestifying employees "would thwart the purposes of the sort of representational testimony clearly contemplated by *Mt. Clemens*"); *Donovan v. Burger King Corp.*, 672 F.2d 221, 224–25 (1st Cir. 1982) (limiting testimony to six plaintiffs from six restaurant locations owned by defendant "in light of the basic similarities between the individual restaurants"); *Gen. Motors Acceptance Corp.*, 482 F.2d at 829 (holding that, based on testimony from sixteen representative employees and a report on six employees that found "employees in this type of job consistently failed to report all the overtime hours worked," "the trial court might well have concluded that plaintiff had established a prima facie case that all thirty-seven employees had worked unreported hours"). In the face of these consistent precedents, many with fact patterns similar to this case, FTS and UniTek point to no case categorically disapproving of representative testimony to prove employer liability to those in the collective action who do not testify. *Tyson*, which held representative evidence to be permissible in a FLSA case certified under Rule 23, confirms the continued validity of these precedents. 136 S. Ct. at 1046–47.

FTS and UniTek next assert that, even if representative testimony is allowed generally, testifying technicians here were not representative of nontestifying technicians. The record suggests otherwise, as we explained above when determining that FTS Technicians were similarly situated. We found that testifying technicians were geographically spread among various FTS profit centers and were subject to the same job duties, timekeeping system, and compensation plan as nontestifying technicians. As *Morgan* highlights, the collective-action framework presumes that similarly situated employees are representative of each other and have the ability to proceed to trial collectively. *See Morgan*, 551 F.3d at 1280.

The dissent also challenges the representative nature of the technicians' testimony, arguing for a blanket requirement of direct correlation because a plaintiff alleging "*the company altered my timesheets*" cannot testify on behalf of one alleging that "*I underreported my time because my supervisor directed me to.*" (Dis. at 41.) Though the time-shaving policy may have been enforced as to individual technicians by several methods, we do not define "representativeness" so specifically—just as we do not take such a narrow view of "similarly situated." *See O'Brien*, 575 F.3d at 585; *see also Cole Enters., Inc.*, 62 F.3d at 778. For the

testifying technicians to be representative of the class as a whole, it is enough that technicians testified as to each means of enforcement of the common, FLSA-violating policy. *See Simmons Petroleum Corp.*, 725 F.2d at 86 (deeming testimony from at least one employee in each category of plaintiffs sufficient to establish a pattern of violations and support an award of damages to all); *see also Sec'y of Labor v. DeSisto*, 929 F.2d 789, 793 (1st Cir. 1991) ("Where the employees fall into several job categories, it seems to us that, at a minimum, the testimony of a representative employee from, or a person with first-hand knowledge of, each of the categories is essential to support a back pay award.").

Here, the jury heard testimony that managers told technicians to underreport hours before and after work and during lunch and that, in the absence of direct orders, FTS otherwise exerted pressure to underreport under threat of reprimand, loss of work assignments, or termination. Or managers just directly altered the timesheets. The dissent's conclusion that the proof was not "remotely representative" (Dis. at 42) neither acknowledges how representative testimony was presented here nor does it follow from the record evidence. There was ample evidence of managers implementing off-the-clock work requirements established and enforced through one corporate policy and ample evidence that the collective group of plaintiffs experienced the same policy enforced through three means. All FTS Technicians were properly represented by those testifying.

The collective procedure adopted by the district court, moreover, was based on FTS and UniTek's agreement, which was memorialized by court order, to limit discovery "to a representative sample of fifty (50) opt-in Plaintiffs" and to approach the district court after discovery regarding "a trial plan based on representative proof" that "will propose a certain number of Plaintiffs from the pool of fifty (50) representative sample Plaintiffs that may be called as trial witnesses." After discovery closed, FTS and UniTek did object to the use of representative proof at trial. But as we have explained, the district court's denial of that motion is not grounds for reversal at this stage.

FTS and UniTek's remaining arguments on liability are simply reiterations of the claims that FTS Technicians are not similarly situated and that the testifying technicians are not representative. FTS and UniTek first complain that the liability verdict form gave the jury an

"all or nothing" choice. But the jury's choice was whether or not FTS applied a single, company-wide time-shaving policy to all FTS Technicians that encompassed each means used to enforce it. The jury found that it did. This accords with precedent recognizing that preventing similarly situated employees from proceeding collectively based on representative evidence would render impotent the collective-action framework. *See, e.g.*, *Garcia*, 770 F.3d at 1307.

Next FTS and UniTek cite *Espenscheid* a second time. As to representative testimony, *Espenscheid* emphasized that the representative evidence before it could not be sufficient because it consisted entirely of testimony regarding "the experience of a small, unrepresentative sample of [workers]" (1.8% of the 2,341 members), which cannot "support an inference about the work time of thousands of workers." 705 F.3d at 775. These are not the facts before us. Testifying technicians here are representative, and the ratio of testifying technicians to nontestifying technicians—5.7%—is well above the range commonly accepted by courts as sufficient evidence, especially where other documentary and testimonial evidence is presented. *See, e.g.*, *Morgan*, 551 F.3d at 1277 (affirming award to 1,424 employees based on testimony from seven, or .49%, in addition to other evidence); *S. New Eng.*, 121 F.3d at 67 (affirming award to nearly 1,500 employees based on testimony from 39, or 2.5%); *Burger King Corp.*, 672 F.2d at 225 (affirming award of back wages to 246 employees based on testimony from six, or 2.4%); *see also DeSisto*, 929 F.2d at 793 (holding "there is no ratio or formula for determining the number of employee witnesses required" but testimony of a single employee is not enough). FTS and UniTek, moreover, had the opportunity to call other technicians but chose not to. *See Morgan*, 551 F.3d at 1278 ("Family Dollar cannot validly complain about the number of testifying plaintiffs when . . . Family Dollar itself had the opportunity to present a great deal more testimony from Plaintiff store managers, or its own district managers, [but] it chose not to.").

In light of the proper use of representative testimony to prove liability, we note the sufficiency of the evidence presented here. FTS Technicians offered testimony from 17 representative technicians and six managers and supervisors, as well as documentary evidence including timesheets and payroll records, to prove that FTS implemented a company-wide time-shaving scheme that required employees to systematically underreport their hours. *See id.* at

1277 ("The jury's verdict is well-supported not simply by 'representative testimony,' but rather by a volume of good old-fashioned direct evidence."); *Gen. Motors Acceptance Corp.*, 482 F.2d at 829 (holding that trial court could conclude violations as to nontestifying employees based on evidence that "employees in this type of job consistently failed to report all the overtime hours worked"). Witnesses attributed the time-shaving policy to corporate, and FTS executives told managers and technicians to underreport overtime. Technicians complained, but FTS took no remedial actions. *See Cole Enters., Inc.*, 62 F.3d at 779 ("[I]t is the responsibility of management to see that work is not performed if it does not want it to be performed."). In response to this evidence and despite agreeing to and participating in the selection of 50 representative technicians and including all 50 on its witness list, FTS and UniTek called only four corporate executives and no technicians.

Our standard of review dictates that we view the evidence in the light most favorable to FTS Technicians and give them the benefit of all reasonable inferences. Based on the trial record and governing precedent, we conclude that the evidence here is sufficient to support the jury's verdict that all FTS Technicians, both testifying and nontestifying, performed work for which they were not compensated.

    2.    Damages

FTS and UniTek object to the use of an estimated-average approach to calculate damages for nontestifying technicians. They argue that an estimated-average approach does not allow a "just and reasonable inference"—the *Mt. Clemens* standard—on the number of hours worked by nontestifying technicians because it results in an inaccurate calculation, giving some FTS Technicians more than they are owed and some less.

We addressed a version of the estimated-average approach in *Cole Enterprises, Inc.*, concluding that "[t]he information [pertaining to testifying witnesses] was also used to make *estimates and calculations* for similarly situated employees who did not testify. The testimony of fairly representative employees may be the basis for an award of back wages to nontestifying employees." 62 F.3d at 781 (emphasis added). Other circuits and district courts have explicitly approved of an estimated average. *See Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468,

472–73, 472 n.7 (11th Cir. 1982) (affirming district court's determination that "waitresses normally worked an eight and one-half hour day" based on "the testimony of the compliance officer and computations based on the payroll records"); *Donovan v. Hamm's Drive Inn*, 661 F.2d 316, 318 (5th Cir. 1981) (affirming as "accepted practice" and not "clearly erroneous" district court's finding that, "based on the testimony of employees, . . . certain groups of employees averaged certain numbers of hours per week" and award of "back pay based on those admittedly approximate calculations" because reversing would penalize the employees for the employer's failure to keep adequate records); *Baden-Winterwood v. Life Time Fitness Inc.*, 729 F. Supp. 2d 965, 997–1001 (S.D. Ohio 2010) (averaging hours per week worked by testifying plaintiffs and applying it to nontestifying plaintiffs); *Cowan v. Treetop Enters.*, 163 F. Supp. 2d 930, 938–39 (M.D. Tenn. 2001) ("From the testimony of the Plaintiffs' and the Defendants' employee records, the Court finds . . . that Plaintiffs worked an average of 89.04 hours per week and applying *Mt. Clemens*, this finding is applied to the entire Plaintiff class to determine the amount of overtime backpay owed for the number of weeks of work stipulated by the parties.").

*Mt. Clemens* acknowledges the use of "an estimated average of overtime worked" to calculate damages for nontestifying employees. 328 U.S. at 686. There, eight employees brought suit on behalf of approximately 300 others. A special master concluded that productive work did not regularly commence until the established starting time. *Id.* at 684. Declining to adopt the special master's recommendation, the district court found that the employees were ready for work 5 to 7 minutes before starting time and presumed that they started immediately. *Id.* at 685. To calculate damages, the district court fashioned a formula to derive an estimated average of overtime worked by all employees, testifying and nontestifying. *Id.* On direct appeal to the Sixth Circuit, we deemed the estimated average insufficient. *Id.* at 686. Though the Supreme Court ultimately agreed with the special master, it reversed our disapproval of the estimated average, explaining that we had "imposed upon the employees an improper standard of proof, a standard that has the practical effect of impairing many of the benefits of the Fair Labor Standards Act." *Id.* at 686, 689.

Disapproving of an estimated-average approach simply due to lack of complete accuracy would ignore the central tenant of *Mt. Clemens*—an inaccuracy in damages should not bar

recovery for violations of the FLSA or penalize employees for an employer's failure to keep adequate records. *See id.* at 688 ("The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'" (quoting *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563 (1931)); *see also Hamm's Drive Inn*, 661 F.2d at 318 (upholding an estimated-average approach and noting that "[e]vidence used to calculate wages owed need not be perfectly accurate, since the employee should not be penalized when the inaccuracy is due to a defendant's failure to keep adequate records"). *Mt. Clemens* effectuates its principles through a burden-shifting framework in which employees are not punished but employers have the opportunity to make damages more exact and precise by rebutting the evidence presented by employees. *See Mt. Clemens*, 328 U.S. at 687–88; *see also Herman*, 183 F.3d at 473. FTS and UniTek had the opportunity at trial to present additional evidence to rebut FTS Technicians' evidence but failed to do so.

*Mt. Clemens*'s burden-shifting framework, in conjunction with the estimated-average approach, functioned here as envisioned. Seventeen technicians working at various locations testified and were cross-examined as to the number of unrecorded hours they worked, allowing the jury to infer reasonably the average weekly unpaid hours worked by each. Testifying technicians were similarly situated to and representative of nontestifying technicians, as specified by the district court's instructions to the jury, and thus the average of these weekly averages applied to nontestifying technicians. The jury found fewer unrecorded hours than testifying technicians claimed; FTS and UniTek thus partially refuted the inference sought by FTS Technicians and their defenses were distributed to make the damages more exact and precise, as the *Mt. Clemens* framework encourages.

Viewing the evidence in the light most favorable to FTS Technicians, we cannot conclude that reasonable minds would come to but one conclusion in favor of FTS and UniTek. Accordingly, the average number of unpaid hours worked by testifying and nontestifying technicians, based on the jury's findings and the estimated-average approach, resulted from a just and reasonable inference supported by sufficient evidence.

**D.      Jury Instruction on Commuting Time**

In another challenge to the jury's determination of unrecorded hours worked, FTS and UniTek argue that the district court erred by instructing the jury on commuting time.  FTS and UniTek do not dispute that the district court accurately instructed the jury on when commuting time requires compensation; they instead argue that, as a matter of law, the instruction should not have been given because a reasonable juror could not conclude that compensation for commuting time was required here.

"This [c]ourt reviews a district court's choice of jury instructions for abuse of discretion." *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007).  A district court does not abuse its discretion in crafting jury instructions unless the instruction "fails accurately to reflect the law" or "if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.*  We generally must assume that the jury followed the district court's instructions.  *See United States v. Olano*, 507 U.S. 725, 740 (1993); *see also United States v. Monus*, 128 F.3d 376, 390–91 (6th Cir. 1997) ("[E]ven if there had been insufficient evidence to support a deliberate ignorance instruction, we must assume that the jury followed the jury charge and did not convict on the grounds of deliberate ignorance.").  Here, the verdict form does not specify whether the jury included commuting time in the average numbers of unrecorded hours, and we assume that the jury followed the district court's instructions by not including commuting time that does not require compensation.

**E.      Calculation of Damages**

FTS and UniTek lastly challenge the district court's calculation of damages.  They argue that the district court (1) took the calculation of damages away from the jury in violation of the Seventh Amendment and (2) used an improper and inaccurate methodology by failing to recalculate each technician's hourly rate and by applying a 1.5 multiplier.  These are questions of law or mixed questions of law and fact that we review de novo.  *See Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005).

We begin with the Seventh Amendment arguments.  The dissent claims that the Seventh Amendment was violated because the trial procedure resulted in "non-representative" proof (Dis.

at 45) and posits a standard requiring a jury in any collective action to "determine the 'estimated average' that *each* plaintiff should receive" (*Id.* at 47 (emphasis added)).  Such an individual requirement for each member of a collective action does not comport with the principles of and precedent on representative proof, and would contradict certification of the case as a collective action in the first place.

Here, moreover, the proof was representative and the jury rendered its findings for the testifying and nontestifying plaintiffs in accordance with the district court's charge.  Finding that "the evidence presented by the representative plaintiffs who testified establishe[d] that they worked unpaid overtime hours," and applying that finding in accordance with the instruction that "those plaintiffs that you did not hear from [would] also [be] deemed by inference to be entitled to overtime compensation," the jury determined that all FTS Technicians had "proven their claims."  The jury accordingly made the factual findings necessary for the court to complete the remaining arithmetic of the estimated-average approach.  The Seventh Amendment does not require the jury, instead of the district court, to perform a formulaic or mathematical calculation of damages.  *See Wallace v. FedEx Corp.*, 764 F.3d 571, 591 (6th Cir. 2014) ("[A] court may render judgment as a matter of law as to some portion of a jury award [without implication of the Seventh Amendment] if it is compelled by a legal rule or if there can be no genuine issue as to the correct calculation of damages."); *see also Maliza v. 2011 MAR-OS Fashion, Inc.*, No. CV-07-463, 2010 WL 502955, at *1 (E.D.N.Y. Feb 10, 2010) (completing arithmetic on shortfalls, if any, in wages paid to plaintiff after jury calculated "month-by-month determinations of the hours worked by, and wages paid to, the plaintiff").  On this record, the Seventh Amendment is not implicated.

At any rate, FTS and UniTek rejected the district court's offer to impanel a second jury to make additional findings and perform the damages calculation.  They had cited their "constitutional rights to a jury" at the end of trial, but at the status conference on damages the court asked if FTS and UniTek wished to have "a panel come in, select another panel, and submit the issues of damages." (R. 444, PageID 10171–72.)  Their counsel responded, "No, your honor.  I don't think that's allowed . . . for these claims." (*Id.* at 10172.)  The court went on to ask, "You would be upset if we did have a jury trial to finish up the damages question?" (*Id.* at

10173.)   Counsel responded, "Well, your Honor, again, it's our position that that's not appropriate." (*Id.*)   Banking instead on their arguments that the estimated-average approach is inappropriate and that any calculation of damages would not be supported by sufficient evidence, counsel maintained that "the only thing, quite frankly, that's left and that is appropriate is an entry of judgment . . . either for the defense or liability for plaintiffs and with zero damages." (*Id.*)   After the court asked for a "more constructive approach from the defense," counsel agreed to a briefing schedule on the calculation of damages.  (*Id.* at 10181.)   Counsel subsequently qualified that FTS and UniTek were "not waiving . . . or changing their position," but the positions referenced were those relied upon at the status conference—the estimated-average-approach disagreement and sufficiency-of-the-evidence argument.   Based on this record, FTS and UniTek abandoned and waived any right to a jury trial on damages that they may have had.

In regard to FTS and UniTek's challenge to the district court's methodology, FLSA actions for overtime are meant to be compensatory.  *See, e.g.*, *Nw. Yeast Co. v. Broutin*, 133 F.2d 628, 630–31 (6th Cir. 1943) (finding that the FLSA "is premised upon the existence of an employment contract" and that recovery authorized by 29 U.S.C. § 216(b) "does not constitute a penalty, but is considered compensation"); 29 U.S.C. § 216(b) ("Any employer who violates [the FLSA] shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . .").   To achieve its purpose, the FLSA directs an overtime wage calculation to include (1) the regular rate, (2) a numerical multiplier of the regular rate, and (3) the number of overtime hours.  *See* 29 U.S.C. § 207; 29 C.F.R. § 778.107.  In a piece-rate system, "the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources" and then dividing "by the number of hours worked in the week for which such compensation was paid."  29 C.F.R. § 778.111(a).  The numerical multiplier for overtime hours in a piece-rate system is .5 the regular rate of pay.  *Id.* (A piece-rate worker is entitled to be paid "a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week. . . .   Only additional half-time pay is required in such cases where the employee has already received straight-time compensation at piece rates or by supplementary payments for all hours worked.").

As for the hourly rate, the amount of "straight time" paid in a piece rate system remains the same regardless of the number of hours required to complete the number of jobs.  The fixed nature of piece rates shows that piece-rate compensation was paid for all hours worked by FTS Technicians, regardless of whether that time was recorded.  It also creates an inverse relationship between the number of hours worked and the hourly rate:  working more hours lowers a technician's hourly rate.  By not recalculating hourly rates to reflect the actual increased number of hours FTS Technicians worked each week, the district court used a higher hourly rate than would have been used if no violation had occurred.  This approach overcompensated FTS Technicians and required FTS and UniTek to pay more for unrecorded overtime hours than recorded overtime hours.  For the damages calculation to be compensatory, therefore, hourly rates must be recalculated with the correct number of hours to ensure that FTS Technicians receive the pay they would have received had there been no violation.

Regarding the correct multiplier, the FLSA entitles piece-rate workers to an overtime multiplier of .5, and the record shows that FTS and UniTek used this multiplier to calculate FTS Technicians' overtime pay for recorded hours.  In explaining the piece-rate system to their technicians, FTS and UniTek provided an example where a technician receiving $1,000 in piece rates for 50 hours of work would receive $100 in overtime compensation.  Reverse engineering this outcome gives us the following formula:  regular rate of $20.00/hour multiplied by a .5 multiplier and 10 overtime hours.  Plugging a multiplier of 1.5 into the formula would result in $300 of overtime pay, overcompensating this hypothetical technician, as it did FTS Technicians. We accordingly reverse the district court's use of a 1.5 multiplier.

Reversal of the district court's calculation of damages does not necessitate a new trial on liability.  We have "the authority to limit the issues upon remand to the [d]istrict [c]ourt for a new trial" and such action does "not violate the Seventh Amendment." *Thompson v. Camp*, 167 F.2d 733, 734 (6th Cir. 1948) (per curiam).  We remand to the district court to recalculate damages consistent with this opinion.

### III.   CONCLUSION

For the foregoing reasons, we AFFIRM the district court's certification of this case as a collective action, allowance of representative testimony at trial, and use of an estimated-average approach; REVERSE the district court's calculation of damages; and REMAND to the district court for recalculation of damages consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. Two questions loom over every multi-plaintiff representative action: Who is representing whom? And can the one group fairly represent the other? Whether it be a class action under Civil Rule 23, a joined action under Civil Rule 20, or as here a collective action under § 216 of the Fair Labor Standards Act, 29 U.S.C. § 216(b), the only way in which representative proof of liability—evidence by some claimants to prove liability as to all—makes any sense is if the theory of liability of the testifying plaintiffs mirrors (or is at least substantially similar to) the theory of liability of the non-testifying plaintiffs. The same imperative exists at the damages stage, where the trial court must match any representative evidence with a representative theory of liability and damages.

The three trial judges who handled this case (collectively as it were) did not heed these requirements. Before trial, the district court mistakenly certified this case as one collective action, not a collective action with two or three sub-classes, as the various and conflicting theories of liability required. At trial, the district court approved a method of assessing damages that violated the Seventh Amendment. After trial, the district court miscalculated damages by failing to adjust plaintiffs' hourly wages and by using an incorrect multiplier. The majority goes part of the way to correcting these problems by reversing the district court's damages calculation. I would go all of the way and correct the first two errors as well.

A recent Supreme Court decision confirms that we should correct these two other errors now. *Tyson Foods, Inc. v. Bouaphakeo* held that a jury may consider the persuasiveness of statistically adequate representative evidence *only* if each class member could have used that evidence in an individual action. 136 S. Ct. 1036 (2016). That principle was not followed here, making our decision inconsistent with *Tyson Foods* and inconsistent with the Seventh Circuit's resolution of the same class-action issue in a nearly identical setting. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013). If we needed any other hints that we have strayed, that came when the Supreme Court vacated our first decision in this case and remanded the controversy to us for reconsideration in light of *Tyson Foods*. I don't doubt that my colleagues

have reconsidered their position, but I do doubt that they have correctly interpreted *Tyson Foods* and the Court's other opinions in this area.  For these reasons and those elaborated below, I must respectfully dissent.

*Collective-action certification.*  The Fair Labor Standards Act permits employees to bring lawsuits on behalf of "themselves and other employees similarly situated."  29 U.S.C. § 216(b).  To determine whether plaintiffs are "similarly situated," we look to (1) "the factual and employment settings of the individual[] plaintiffs," (2) "the different defenses to which the plaintiffs may be subject," and (3) "the degree of fairness and procedural impact of certifying the action as a collective action," among other considerations.  *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584 (6th Cir. 2009) (quotation omitted), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016).  Helpful as this checklist may be, it should not obscure the core inquiry:  Are plaintiffs similarly situated *such that* their claims of liability and damages can be tried on a class-wide and representative basis?  7B Charles Alan Wright et al., Federal Practice and Procedure § 1807 (3d ed. 2005).

That is where the plaintiffs fall short.  They claim that the defendants violated the Fair Labor Standards Act in three distinct ways:  (1) by falsifying employees' timesheets; (2) by instructing employees to underreport their hours; and (3) by creating incentives for employees to underreport by rewarding "productiv[ity]" and scheduling fewer shifts for those who worked too many hours. R. 200 at 8.  The problem with the plaintiffs' approach is that a jury could accept some of their theories of liability while rejecting others, and yet the verdict form gave the jury only an all-or-nothing-at-all option.  Assume that, as plaintiffs allege, supervisors at a certain subset of the defendants' offices directed employees to underreport (which violates the FLSA), while supervisors at a distinct subset of offices merely urged employees to be more efficient (which normally will not violate the FLSA).  *See Davis v. Food Lion*, 792 F.2d 1274, 1275–78 (4th Cir. 1986); *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972).  A jury could decide that statutory violations occurred at the first group of offices but not the second (perhaps because the calls for efficiency did not rise to the level of a statutory violation, perhaps because the plaintiffs did not present enough evidence to conclude that supervisors pressured their employees to underreport, or perhaps because the only pressure—to be efficient—was self-

induced and not a violation at all). What, then, is the jury tasked with delivering a class-wide verdict to do? It must say either that the defendants are liable as to the entire class or that the defendants are liable as to no one—when the truth lies somewhere in the middle. Just as it would be unfair to impose class-wide liability for all 296 employees based on the "representative" testimony that *some* supervisors directed employees not to report their hours, so it would be unfair to deny class-wide liability based on the "representative" testimony that *some* supervisors merely urged employees to be more efficient. *See Tyson Foods*, 136 S. Ct. at 1046–47.

The evidence at trial illustrates the problem. Start with Richard Hunt, who said he was instructed "to dock an hour for lunch whether [he] took it or not." R. 456 at 125. Compare him to Paul Crossan, who testified that he underreported his time "because [he] wanted more jobs for more money for [him]self," thinking he would not be scheduled for extra shifts if he recorded too many hours. R. 448 at 77. Then compare them both to Stephen Fischer, who said he was instructed to underreport his hours on some occasions, was told to *over-report* his hours on other occasions, and in still other cases underreported because he wanted to "be routed daily and not miss any work." R. 456 at 78. With so many variables in play—different employees offering different testimony about different types of violations—how could a jury fairly assess liability on a class-wide, one-size-fits-all basis? I for one do not see how it could be done.

The Seventh Circuit recently explained how all of this should work in its unanimous opinion in *Espenscheid*. The case not only arose in the same industry and not only concerned the same worker-incentive plans, but it also involved the *same defendant in this case*. *Espenscheid*, 705 F.3d at 772–73. Now that is an apt use of the term similarly situated. In denying certification, Judge Posner explained the "complication presented by a worker who underreported his time, but did so . . . not under pressure by [the defendant] but because he wanted to impress the company with his efficiency." *Id.* at 774. The problem, as in this case, was that some plaintiffs were instructed to underreport; others underreported to meet the company's efficiency goals; and still others alleged that, while they recorded their time correctly, the company miscalculated their wages. *Id.* at 773–74; *see Espenscheid v. DirectSat USA, LLC*, No. 09-cv-625-bbc, 2011 WL 2009967, at *2 (W.D. Wis. May 23, 2011), *amended by* 2011 WL

2132975 (W.D. Wis. May 27, 2011). Because the plaintiffs offered no way to "distinguish . . . benign underreporting from unlawful conduct by [the defendant]"—and no other way to prove their multiple, conflicting theories of liability on an all-or-nothing class-wide basis—the Seventh Circuit refused to let them proceed collectively. 705 F.3d at 774.

The court also worried that, because each employee did not perform the same tasks, they were not sufficiently similar to permit a class-wide determination of liability or damages, *id.* at 773; that assessing damages would require a "separate evidentiary hearing[]" for each member of the class, *id.*; that the plaintiffs' plan to use "representative" proof with their hand-picked employees would not work because the various theories of liability made it impossible to have representative employees in a single class, *id.* at 774; and that "the experience of a small, unrepresentative sample" of testifying workers could not support "an inference about the work time of" the remaining plaintiffs, *id.* at 775. Although the district court had proposed to divide the employees into three sub-classes, "corresponding to the three types of violation[s]" alleged, plaintiffs' counsel opposed the court's plan and "refus[ed] to suggest a feasible alternative, including a feasible method of determining damages." *Id.* at 775–76. We could adopt the Seventh Circuit's opinion as our own in this case, since it highlights precisely the same problems that afflicted the plaintiffs' trial plan. Because the employees here did not offer a "feasible method of determining" liability and damages, the district court should have decertified their case. In the last analysis, the Seventh Circuit's decision respects the lessons of *Tyson Foods*, 136 S. Ct. at 1048–49, while our decision with respect does not.

All of this does not mean that a collective action was not an option in our case. It means only that plaintiffs should have accounted for their distinct theories by dividing themselves into sub-classes, one corresponding to each theory of liability under the statute—and indeed under their own trial plan. That is a tried and true method of collective-action representation, and nothing prevented plaintiffs from using it here.

The plaintiffs offer two reasons for concluding that their trial plan worked, even without sub-classes. First, they argue that they were subject to a "unified" company-wide "time-shaving policy" and that their trial plan enabled them to prove this policy's existence on a class-wide basis. Appellees' Br. 41. But what was the relevant policy? Was it that supervisors should alter

employees' timesheets? That they should instruct employees to underreport their hours? That they should subtly encourage employees to underreport by urging them to be efficient? The plaintiffs define the company-wide "policy" at such a lofty level of generality that it encompasses *multiple* policies, each one corresponding to a different type of statutory violation and some to no violation at all. The FLSA does not bar "benign underreporting" where workers try "to impress the company with [their] efficiency in the hope of obtaining a promotion or maybe a better job elsewhere—or just to avoid being laid off." *Espenscheid*, 705 F.3d at 774. Nor does it violate the FLSA to reduce an employee's amount of work to avoid increasing overtime costs. *See* 29 C.F.R. § 785.13; *see also U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 779–80 (6th Cir. 1995); *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011). Yet what purports to link the plaintiffs' claims (cognizable and non-cognizable alike) is merely the theory—at a vertigo-inducing height of generality—that the defendants violated the overtime provisions of the FLSA. A company-wide "time-shaving" policy is lawyer talk for a company-wide policy of violating the FLSA. That does not do the trick. And most assuredly it does not do the trick when one of the theories does not even violate the FLSA.

The majority worries that, by requiring sub-classes to litigate the relevant policies, my approach would limit liability to donning-and-doffing cases. But those are not the only types of cases in which a company-wide policy—in the singular—permits class-wide resolution of liability and damages. Imagine that FTS and UniTek, rather than employing different practices in different offices, told supervisors at every location to dock the pay of employees who worked at least fifty hours; or declined to pay employees for compensable commuting time; or stated that technicians in each office should not be paid for their lunch break, even if they worked through it; or used punch-in clocks that systematically under-recorded employees' time. The plaintiffs in each of these cases could prove liability and damages on a class-wide basis, which means they could use the collective-action device to litigate their claims. *See Tyson Foods*, 136 S. Ct. at 1042–43. But if, as here, the company employs multiple policies, as FTS and UniTek allegedly did, the plaintiffs must bring separate actions or prove violations using sub-classes (or any other trial plan that permits class-wide adjudication). The majority warns that my approach "would compel employees to bring a separate collective action . . . for unreported work required by an employer before clocking in, and another for work required after clocking out." *Supra* at 17.

But of course that "level of granularity," *id.* at 15, is not required, and crying wolf won't make it so. All that's required is an approach that allows plaintiffs to litigate their claims collectively only when they can *prove* their claims collectively.

Second, the plaintiffs argue that the jury could assess class-wide liability by relying on "representative" proof. They note that, before trial, the parties agreed to take discovery on a "sample" of fifty employees—forty chosen by the plaintiffs, ten by the defendants. R. 249-1 at 2. The plaintiffs called seventeen of those employees to testify at trial. This representative testimony, say the plaintiffs, gave the jury enough information to reach a class-wide verdict, which means the employees were sufficiently similar to permit collective-action certification and collective-action resolution.

That representative proof works in some cases does not mean it works in all cases. *Tyson Foods*, 136 S. Ct. at 1048. The question—always—is *who* can fairly represent *whom*. *Id.* at 1047–48. If the proof shows systematic underreporting by the employer of, say, the time it takes to don and doff the same protective clothing—giving the same type of workers credit for three minutes when the proof shows it takes seven minutes—representative proof works just fine. In that setting, there is evidence about how long it takes workers to don and doff and proof that the same deficiency was applied to all plaintiffs. But I am skeptical, indeed hard pressed to believe, that plaintiffs who allege one theory of liability (*e.g.*, *the company* altered my timesheets) can testify on behalf of those who allege another (*e.g.*, *I* underreported my time because my supervisor directed me to) or still another (*e.g.*, *I* altered my time because the company urged me to be efficient). Plaintiffs who were told to underreport, for example, tell us very little about plaintiffs at different offices, working under different supervisors, who underreported based on efforts to improve efficiency. That is why the majority goes astray when it suggests that "it is enough that technicians testified as to each means of enforcement of the common, FLSA-violating policy." *Supra* at 26. The question is not whether each "means of enforcement" was represented; it is whether each means of enforcement was represented *in proportion to* its actual employment by FTS and UniTek across the entire class—something that the plaintiffs never attempted to prove.

The Supreme Court's intervening decision in *Tyson Foods*, of which the district court did not have the benefit, confirms all of this and more. Not all inferences drawn from representative evidence, it makes clear, suffice to establish class-wide liability or damages. 136 S. Ct. at 1048. "Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked." *Id.* at 1048–49. "If the sample could have sustained a reasonable jury finding as to hours worked in each employee's individual action," for example, "that sample is a permissible means of establishing the employees' hours worked in a class action." *Id.* at 1046–47. By contrast, a sample that fails to account for the various theories of liability for employees working at different locations under different supervisors is exactly the sort of representative evidence that fails to establish class-wide liability. Drawing inferences from such nominally representative evidence is neither reasonable nor just.

*Tyson Foods*, it is true, is a different case with different facts. Most cases are. And for that reason, the court is correct to say that *Tyson Foods* does not "compel" us to change our earlier decision. *Supra* at 12. But that analysis answers the wrong question. The Court does not enter "GVRs"—orders granting the petition for a writ of certiorari and vacating the lower court decision for reconsideration in light of intervening authority—only when new authority *compels* us to rule differently. As often as not, GVRs are used when intervening authority suggests a better answer may exist. Just so here, as the Seventh Circuit has already concluded.

Does anyone doubt how this case would come out if the roles were reversed—if most of the testifying plaintiffs underreported on their own while only a few were told to do so? We would hesitate, I suspect, to say that the testifying employees were "representative" of their non-testifying peers, especially if the jury returned a verdict for the defendants. What is sauce for one, however, presumably should be sauce for the other, making the district court's certification order perilous for defendants *and* plaintiffs alike. No doubt, collective actions permit plaintiffs to rely on representative proof. But that proof must be *representative*—and here plaintiffs' own evidence demonstrates that it was not remotely representative. *See Tyson Foods*, 136 S. Ct. 1048; *Espenscheid*, 705 F.3d at 774; *see also Sec'y of Labor v. DeSisto*, 929 F.2d 789, 793–94 (1st Cir. 1991); *Reich v. S. Md. Hosp., Inc.*, 43 F.3d 949, 952 (4th Cir. 1995).

The plaintiffs claim that *Anderson v. Mt. Clemens Pottery Co.* permits this trial plan. *See* 328 U.S. 680 (1946). But that is a case about damages, not liability. *See Tyson Foods*, 136 S. Ct. at 1047. *Mt. Clemens Pottery* holds that, *after* an employee has shown that he "performed work and has not been paid in accordance with the" FLSA, he may "show the amount and extent of that work as a matter of just and reasonable inference." 328 U.S. at 687–88. The "just and reasonable inference" rule, in other words, comes into play only when the "fact of damages" is "certain" but the "amount of damages" is unclear. *Id.* at 688. As *O'Brien* explains, "*Mt. Clemens Pottery* and its progeny do not lessen the standard of proof for showing that a FLSA violation occurred." 575 F.3d at 602; *see also Tyson Foods*, 136 S. Ct. 1048–49; *Shultz v. Tarheel Coals, Inc.*, 417 F.2d 583, 584 (6th Cir. 1969) (per curiam); *Porter v. Leventhal*, 160 F.2d 52, 58 (2d Cir. 1946); *Kemmerer v. ICI Ams. Inc.*, 70 F.3d 281, 290 (3d Cir. 1995); *Brown v. Family Dollar Stores of Ind., LP*, 534 F.3d 593, 594–95 (7th Cir. 2008); *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013); *Alvarez v. IPB, Inc.*, 339 F.3d 894, 914–15 (9th Cir. 2003). The case thus provides no support for the plaintiffs' claim that they can show liability under a "relaxed" standard of proof. Appellees' Br. 39.

The plaintiffs counter that the defendants agreed to representative discovery, claiming that this means they necessarily agreed to representative proof at trial. But to take the one step does not require the other. The only way to determine whether one group of plaintiffs is representative of another is to gather information about both groups, typically by conducting discovery. When the defendants, after taking depositions, learned that the selected employees were not representative of their peers, they objected to the plaintiffs' plan to use representative proof at trial. Then they objected to it three more times. We have no right to penalize them for failing to raise this objection *before* discovery when the targeted problem did not materialize until *after* discovery was complete. Put another way, there is a difference between *alleging* a uniform policy of underreporting and *proving* one. Once discovery showed there was no uniform policy, the defendants properly objected to representative proof. *See Tyson Foods*, 136 S. Ct. at 1048–49.

The plaintiffs lean on *O'Brien v. Ed Donnelly Enterprises* to overcome these problems but it cannot bear the weight. 575 F.3d 567 (6th Cir. 2009). *O'Brien* said that plaintiffs are similarly situated when "their claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Id.* at 585. But *O'Brien*'s point was that, *if* plaintiffs offer a trial plan that enables them to prove their case on a class-wide basis, the court should permit the suit to proceed as a collective action. Such a trial plan, in some cases, may involve "individualized" presentations of proof; in other cases, representative proof may suffice. *Id.* But in all cases, plaintiffs must offer *some* reasoned method for the jury to assess class-wide liability—and that is just what the plaintiffs failed to do here. *See Tyson Foods*, 136 S. Ct. at 1048–49. As for *O'Brien*'s *holding*, it was that the opt-in plaintiff was *not* similarly situated to the other plaintiffs, "because she failed to allege that she suffered from" the "unlawful practice[s]" endured by those employees. *O'Brien*, 575 F.3d at 586. Just so here, where the plaintiffs failed to offer a means of proving that they suffered from "unlawful practice[s]" on a class-wide basis.

Finally, the plaintiffs (and the majority) try to distinguish this case from the Seventh Circuit's decision in *Espenscheid*. It is true that the Seventh Circuit applies the Rule 23 class-action standard to assess whether plaintiffs are "similarly situated" and that our circuit has rejected Rule 23(b)(3)'s "predominance" inquiry as an element of the "similarly situated" analysis. *Compare Espenscheid*, 705 F.3d at 772, *with O'Brien*, 575 F.3d at 584–85. But that makes no difference. Under both the Seventh Circuit's approach and our own, one way for plaintiffs to satisfy the "similarly situated" inquiry is to allege "common theories" of liability that can be proved on a class-wide basis. *See O'Brien*, 575 F.3d at 585. That is exactly what the Seventh Circuit found to be missing when it held that the *Espenscheid* plaintiffs failed to distinguish "benign underreporting from unlawful conduct." 705 F.3d at 774. And that is exactly what is missing here. The majority also notes that *Espenscheid* involved a larger group of plaintiffs than this case. But that had no bearing on the Seventh Circuit's analysis. Nor could it. Whether the collective action consisted of twenty employees or two thousand, the problem was that those employees could not prove class-wide liability—and the same reasoning applies to the class of two-hundred-plus plaintiffs today. An error does not become harmless because it affects "just" 200 people or "just" two companies.

*Seventh Amendment.* If class-wide liability turns on non-representative proof, that skews the liability finding. And it should surprise no one when a skewed liability determination leads to a skewed damages calculation. So it happened in this case.

The majority to its credit corrects one problem with the damages calculation. I would correct the other. The plaintiffs provided no evidence from which the jury (or, alas, the court) could conclude that the testifying plaintiffs failed to record a comparable number of hours on their timesheets as their non-testifying peers. The district court nonetheless adopted a trial procedure that *assumed* that each of the testifying and non-testifying employees was similarly situated for purposes of calculating damages. That procedure not only ignored the non-representative nature of the proof, but it also violated the Seventh Amendment. *See Tyson Foods*, 136 S. Ct. at 1049.

Here's how the district court calculated damages: When the jury returned a verdict for the plaintiffs, it identified the average number of weekly hours that each of the seventeen testifying employees had worked but had not recorded on their timesheets. The court then averaged together the number of unrecorded hours for each testifying employee, assumed that this value was also the average number of unrecorded hours for each of the 279 *non*-testifying employees, and awarded damages to the class as a whole.

The Seventh Amendment bars this judge-run, average-of-averages approach. "[N]o fact tried by a jury," the Amendment reads, "shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. That means a court may not "substitut[e] its own estimate of the amount of damages which the plaintiff ought to have recovered[] to enter an absolute judgment for any other sum than that assessed by the jury." *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 766 (6th Cir. 2008) (quotation omitted). Yet that is just what the court did. The jury awarded damages to the seventeen testifying plaintiffs, but the court—on its own and without any jury findings—extrapolated that damages award to the remaining 279 plaintiffs.

*Tyson Foods* confirms the jury's starring role in determining damages. "Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury."

*Tyson Foods*, 136 S. Ct. at 1049. "Reasonable minds may differ as to whether the average time . . . calculated . . . is probative as to the time actually worked by each employee." *Id.* But "[r]esolving that question . . . is the near-exclusive province of the jury," not the judge. *Id.* The jury in this case may not have thought it appropriate to extrapolate the damages award to the remaining 279 plaintiffs. Indeed, the jury in *Tyson Foods* more than halved the damages recommended by the expert in that case. *Id.* at 1044.

The plaintiffs defend this procedure by noting that a court may "render judgment as a matter of law as to some portion of a jury award if it is compelled by a legal rule or if there can be no genuine issue as to the correct calculation of damages." *Lulaj*, 512 F.3d at 766. But the district court did not award damages based on a legal conclusion; it did so based on its finding that the non-testifying plaintiffs failed to record the same number of hours, on average, as their testifying peers. That is a *factual finding* about the number of hours worked by each plaintiff. And the Seventh Amendment means that a jury, not a judge, must make that finding. *See Tyson Foods*, 136 S. Ct. at 1049.

The majority portrays the district court's damages determination as a matter of "arithmetic," a "formulaic or mathematical calculation." *Supra* at 32. How could that be? There was no finding by the jury about the overtime hours worked by the non-testifying employees and thus no basis for the judge to do the math or apply a formula. Imagine that ten plaintiffs bring a lawsuit. The court gives the jury a verdict form, listing the names of five plaintiffs and asking the jury to write down the amount of damages those plaintiffs should receive. After the jury does so, the judge decides that the remaining five plaintiffs are similar to their peers and decides they should receive damages too, all in the absence of any finding by the jury about the similarity of the two classes of plaintiffs. It then doubles the jury's award and gives damages to all ten plaintiffs. I have little doubt we would find a Seventh Amendment violation, and the majority says nothing to suggest otherwise. *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990); *Wallace v. FedEx Corp.*, 764 F.3d 571, 591–94 (6th Cir. 2014). That conclusion should not change simply because this case arises in the collective-action context, where the "estimated average approach" is the accepted practice. The missing ingredient is that the jury, not the judge, must still determine the "estimated

average" that each plaintiff should receive. And no court to my knowledge—either in the collective-action context or outside of it—has endorsed a procedure by which the jury awards damages to testifying plaintiffs while the judge awards damages to their non-testifying counterparts with no finding from the jury as to the latter group.

Nor did the district court cure the problem when it instructed the jury that non-testifying plaintiffs would be "deemed by inference to be entitled to overtime compensation." R. 463 at 28. This instruction told the jury only that, if it found liability with respect to the testifying plaintiffs, it also was finding liability with respect to the non-testifying plaintiffs. The court did not inform the jury that its damages calculations would be averaged together to make a class-wide finding. Nor did the court charge the jury with determining the estimated average that each plaintiff should receive. All the instructions did, in effect, was tell the jury that the judge would calculate damages. But it should go without saying that a court cannot *correct* a Seventh Amendment violation by *informing* the jury that a Seventh Amendment violation is about to occur.

For the same reason, *Mt. Clemens Pottery* has nothing to do with this case. It is not a Seventh Amendment case. It did not permit a judge, rather than a jury, to decide whether the damages of the testifying and non-testifying employees were similar and thus could be assessed on an "estimated average approach." And it involved compensation for employees' preliminary work activities, which took roughly the same amount of time for each employee to perform. 328 U.S. at 690–93. The jury in today's case, however, found that the number of unrecorded hours varied widely among the testifying technicians—from a low of eight hours per week to a high of twenty-four, with considerable variation in between. This range of evidence increased the risk of under-compensation for employees who worked the most hours (and over-compensation for those who worked the fewest) in a way that *Mt. Clemens Pottery* never needed to confront. And that risk of course heightens the importance of keeping the damages determination where it belongs—with the jury, which is best equipped to undertake the intricate fact-finding required when the employees' unrecorded hours span so broadly.

*Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468 (6th Cir. 1999), is of a piece. It said that the *Mt. Clemens Pottery* framework enables juries to find damages "as a matter of just

and reasonable inference" when employers do not keep adequate records of their employees' time. *Id.* at 472. Nowhere does *Herman* endorse the procedure used in this case, which permitted the *court* to *assume* (not even infer) that all employees failed to record the same number of hours on their timesheets.

The majority claims in the alternative that the defendants forfeited their claim to a jury trial on damages. Not true. The defendants opposed the district court's ruling that the court could calculate damages, and they reiterated their objections at a post-trial status conference. Consistent with these objections, the district judge did not decide that defendants forfeited the point. He instead explained he was "at a little bit of a loss" because he had not tried the case and only "now" "realize[d]" that a "residual issue" remained. R. 444 at 6. In response, the district court offered to call a second jury to calculate damages, and asked the defendants what steps would be "appropriate[.]" *Id.* at 6–7. Counsel responded, "[W]e think the only thing . . . that's left and that is appropriate is an entry of judgment . . . either for the defense or liability for plaintiffs . . . with zero damages." *Id.* at 7. "[P]art of our position," counsel concluded, "is to be clear for any type of post-trial appellate record" that the defendants were "not waiving . . . or changing their position." *Id.* at 19–20. Nowhere in this exchange do the defendants forfeit their Seventh Amendment argument; at times they indeed reaffirm it. Of course, even if the defendants *had* forfeited or for that matter waived their right to a jury trial (which they did not), the appropriate response would have been to conduct a *bench trial* on damages, not to impose damages as a matter of law with no finding by anyone—judge or jury—about the right amount. *Cf. Singer v. United States*, 380 U.S. 24, 26 (1965).

\*          \*          \*

It is not difficult to imagine how this case could have gone differently. The plaintiffs could have organized themselves into sub-classes, one corresponding to each type of alleged statutory violation. *See, e.g.*, *Fravel v. County of Lake*, No. 2:07 cv 253, 2008 WL 2704744, at \*3–4 (N.D. Ind. July 7, 2008). Or they could have complained to the Department of Labor, which may seek damages on the employees' behalf. *See* 29 U.S.C. § 216(c); *Espenscheid*, 705 F.3d at 776. But the plaintiffs did not take either route. Because they did not do so— because they proposed a trial plan that violated both statutory and constitutional requirements—

we should remand this case and allow them to propose a new procedure that permits reasoned and fair adjudication of their representative claims. *See Tyson Foods*, 136 S. Ct. at 1048–49.

The majority seeing things differently, I respectfully dissent.